# Richmond

CAROLINE V. TULL v. FLEMING BROTHERS LUMBER & MANUFACTURING COMPANY, A CORPORATION.

March 7, 1949.

Record No. 3418.

Present, All the Justices.

The opinion states the case.

*Benjamin W. Mears* and *L. H. Mears*, for the plaintiff in error.

*Stewart K. Powell, Ernest Ruediger* and *Frances Fletcher Ames*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

On June 30, 1944, Mrs. Caroline V. Tull sold, by written contract, to Fleming Brothers Lumber & Manufacturing Company, a corporation, hereinafter referred to as appellee, all of the timber located on two certain tracts of land in Accomack county, Virginia, for the sum of $3,000 cash. The contract of sale gave the appellee the right to cut and remove the timber within two years from the date of its execution. It contained the following covenants and warranties:

"And the said party of the first part covenants to and with said party of the second part, that she is seized of said premises in fee; that she has right to convey the timber above described; that said land and timber is free from all encumbrance, and that she will warrant and defend the title to the timber above described and the privileges herein granted to the said party of the second part, his successors and assigns, against the claims of all persons whomsoever."

Shortly after its purchase, the appellee proceeded to cut and remove the timber from one of the parcels which constituted a part of a tract of land called the Twyford Farm. This cutting was completed prior to April, 1945. In April, 1945, it attempted to enter upon the second tract, a parcel containing about eleven acres, the title and ownership of

which is herein involved, to cut the timber thereon. William H. Waterfield advised the appellee that he and his brother, John J. Waterfield, had purchased the tract at a judicial sale on January 18, 1941; that their deed was of record in the Clerk's Office of the Circuit Court of Accomack county; that they had been in open and continuous possession since their purchase; and that they would shoot any one who trespassed on the land for the purpose of cutting their timber.

The appellee then caused the records of the clerk's office of Accomack county to be examined, and, being advised that Waterfield brothers held the recorded title to a parcel of land which included in its description the eleven acres in controversy, notified Mrs. Tull of the deed and the threats of the grantees to protect their property. Mrs. Tull thereafter took no steps to defend or clear her title. She merely told the appellee she claimed title and ownership of the disputed land under the will of her late father, Harry T. White.

Under these circumstances, the appellee refrained from cutting the timber on the said tract. On October 23, 1946, it filed its petition for attachment in the Circuit Court of Accomack county against Mrs. Tull, alleging damages in the sum of $2,500, for breach of warranty. After some preliminary matters were disposed of, the cause was submitted to the court for trial on its merits, without intervention of a jury. After hearing the evidence, the court entered judgment against Mrs. Tull for the sum of $1,000, with interest from June 30, 1944, and the cost of the proceeding.

The appellant asks us to reverse the judgment on the grounds that it was contrary to the law and the evidence; without evidence to support it; that there had been no eviction of Mrs. Tull since her purchase in 1940; and that appellee having failed to cut the timber within the two-year period granted in its contract was barred from bringing this action.

A correct determination of the case is almost wholly dependent on the facts.

The evidence presented to us consists of the testimony of the witnesses in narrative form and the original papers in the chancery cause of *"Harry E. White, Admr. c. t. a. of the Estate of Harry T. White, deceased, etc., Plaintiff* v. *Caroline V. Tull, et als., Defendants,"* heretofore pending in the Circuit Court of Accomack county.

The evidence may be summarized as follows:

In 1934, Harry T. White, father of the appellant, Caroline V. Tull, died testate seized and possessed of a considerable amount of real estate in Accomack county, Virginia. His will, in his own handwriting, was rather crudely drawn. The pertinent portions are set out in the margin.*

With the exception of some lands devised to his grand-daughter, he apparently sought to devise his remaining property, one half to his son, Harry E. White and one

---

* "May 10th 1933

"This is my only will I lend my grand daughter Anne White Tull the North side of my Sea side farm near Atlantic known as the E. T. White farm beginning at the North West corner Slate in farm out let & the Tunnell farm join running East straight line between Tunnels heirs to Wats bay to oridinary high water mark then South up to cleared land then West 100 yards following centre branch to cleared land south side to roads cuting of part of land cultivated by Tobe Williams then straight line to mill lot then following south side of road to starting point excepting part out let used by main farm

"I lend to my son Harry E. White the balance of my seaside as descred above joining the part lent to Anne White Tull & all oyster shore on farm up to ordinary high water mark except the cleared land joining the Tryford farm on the north East also 12 ft road from the nearest point following a straight line all to county road

"I lend to my daughter Mrs C White Tull the farm known as the try-ford farm joining the E. T. White farm on the north to ordinary high water mark on Wats bay on the east Thos G. Nock on the South & Thos Thornton the East I also lend my daughter Mrs C White Tull for the use farm lent her a piece woods land in south corner main farm bounded on north & East the old out let road on South by Matthews & West by Lewis Thornton also lend to my grand daughter Anne W Tull for the use of her part land lent the house and lot occupied by Tobe Williams bound on the north by center branch on west by centre branch on the south by T. G. Nock on west by Tho Thornton and 12 ft to out let of the Tryford farm at their death give to nearest blood heirs all shall have the to cut & sell timber if they desire & apply to own use."

half to his daughter, Caroline V. Tull, each subject to certain limitations. Under the will, the southern half of a tract known as the "White Homestead Farm" was allotted to Harry E. White. The northern half of the homestead farm and the tract of land known as the "Twyford Farm" were allotted to Mrs. Tull.

Included in the will, and giving rise to this controversy, was the following language:

"I also lend my daughter Mrs C White Tull for the use farm lent her a piece woods lands in south corner main farm bounded on north & East the old out let road on South by Matthews & West by Lewis Thornton, * * *."

For many years the homestead farm has been listed on the tax books of Accomack county as containing one hundred and eighty acres until its division into two parts of ninety acres each. The Twyford farm and the southern half of the homestead farm are contiguous parcels of land, each facing the waters of Chincoteague Bay. The homestead farm, however, extends to the west approximately one half of a mile further than the Twyford Farm. The eleven-acre tract of woodland in controversy is triangular in shape, and is situated in the southwestern corner of the southern half of the homestead farm, and it is at least one quarter of a mile distant from the closest point of the Twyford Farm. The southern half of the homestead farm, including the eleven-acre tract, forms a perfect rectangle.

No executor was named in the will of Harry T. White, and testator's son, Harry E. White, qualified as administrator of his father's estate, with the will annexed. In the belief that testator's personal property was sufficient to pay his debts, the devisees entered upon the properties which they thought were devised to them respectively. It developed, however, that the personal property was insufficient.

In March, 1936, Harry E. White, individually and as administrator, filed a bill in chancery in the Circuit Court of Accomack county, entitled *"Harry E. White, Adm'r c. t. a. of the Estate of Harry T. White, Deceased, etc., Plain-*

*tiff* v. *Caroline V. Tull, et als., Defendants.*" The bill recited the facts stated and other facts. The complainant alleged that the will of his decedent "in many respects is indefinite, and that he is unable to determine from said instrument the boundaries of the property intended to be given to the various devisees by ·the same, nor are said devisees able to determine the nature of the estate given them by said will." He asked for a construction of the will, instruction as to the proper course to pursue, prayed for a sale of the timber and a sufficient amount of testator's land to pay his indebtedness and for partition of the remainder of land or sale and division of the proceeds.

Mrs. Tull answered the bill, joining in the request that the will of her father be construed, and averring she desired "that whatever is necessary to establish the boundaries of the real estate involved be done."

The cause was referred to a commissioner in chancery, who reported that the personal estate was insufficient for the payment of the debts, and recommended the sale of such portion of the land and timber as might be necessary to satisfy the creditors of the decedent. Duly appointed special commissioners were unable to make satisfactory sale because of depressed economic conditions, and they reported to the court that .it appeared a sale of all of the testator's lands and timber in Accomack county would have to be made in order to obtain sufficient funds to pay his debts.

Mrs. Tull then submitted an offer to the court to purchase all of the land which her father had sought to devise to her and her daughter in consideration of which she would agree to pay into court a sum equal to one half of the total debts of the estate, plus the cost of the suit, and further, in the event that the real estate devised to her brother, Harry E. White, did not bring a sufficient sum at public auction to pay the remaining half of said debts, she would pay the deficiency.

By decree entered on December 19, 1940, the offer of Mrs. Tull was accepted, and the special commissioners were

directed to sell at public auction four tracts or parcels of land described as follows:

(1) A tract of land known as "Cropper Swamp."

(2) A tract of land known as "Milbourne Farm."

(3) A tract of land known as "Copes Farm."

(4) That part of the "White Homestead Farm," situate near Atlantic, in Atlantic Magisterial District, in the County and State aforesaid, which was devised to Harry E. White, the same being bounded and described as follows, towit: The Southern half of the said "White Homestead Farm" the same being bounded on the North, by the part of said Farm devised to Ann White Tull, now Ann White Wilmer; on the East, by low water mark of Watts Bay; on the South, by the "Twyford Land" devised to Carrie V. Tull; and on the West, by the Louis Thornton Land and the land belonging to Upshur Bunting;—together with a right-of-way to said property and also all of the oyster shore between high and low water mark on said "White Homestead Farm."

By the same decree, the special commissioners were directed to convey to Mrs. Tull, upon payment by her of one half of the indebtedness of her father, the following described lands:

(1) A tract known as "Big Free School."

(2) A tract known as the "Twyford Farm,"—"containing 66 acres, more or less, being bounded on the north by the 'E. T. White Farm,' hereinbefore referred to as the 'White Homestead Farm;' on the east by Chincoteague Bay; on the south by the land of Thomas G. Nock; and on the west by the land of Thomas Thornton and Lewis Thornton."

(3) A tract of land known as the "Kerby Land."

(4) The northern one half of the "White Homestead Farm."

It will be noted that each of these above farms was specifically described in the decree, and there is no mention or description of the eleven-acre tract of timber land in controversy.

Pursuant to the above decree, the special commissioners, on January 18, 1941, exposed to sale at public auction the

four parcels of land first above described. At this sale, J. J. Waterfield and William H. Waterfield became the purchasers of the southern half of the "White Homestead Farm," under the description above, being the same description given in the decree directing the sale and in the advertisement of sale. Mrs. Tull was present at the sale and purchased one of the several parcels of land sold.

On February 11, 1941, the court confirmed all sales without objection or exception, expressly reserving consideration as to the construction of the will of Harry T. White, deceased, as respected the lands involved. In accordance with the decree, a deed of conveyance was made of the southern half of the "White Homestead Farm" to the Waterfields under date of February 11, 1941.

Mrs. Tull having complied with the terms of the decree of December 19, 1940, the special commissioners, by deed dated February 21, 1941, conveyed to her the four parcels of land which she purchased under the exact descriptions given in the said decree. The deed was drawn by one of the special commissioners, who was attorney for Mrs. Tull throughout this proceeding and in the chancery suit of "*White* v. *Tull.*" Contemporaneous therewith Mrs. Tull obtained a loan and executed a deed of trust to secure the same on the above property, described as the land conveyed to her by the special commissioners in the suit of "*White* v. *Tull*," together with other property, naming as trustee her attorney. Neither of the above deeds made any mention of the eleven-acre tract of land.

Mrs. Tull contends that the eleven-acre tract was devised to her as a part of the Twyford farm; that her offer to purchase the lands devised to her and her daughter included the eleven acres; and that through inadvertence it was omitted from the description of the land conveyed to her in the court proceedings. She said that she has continued in possession of the eleven acres from the death of her father until the present time. Three witnesses testified that at various intervals prior to 1942, they had, as tenants, used and treated the eleven acres as a part of the Twyford farm.

The contentions of Mrs. Tull, however, are not in accord with her actions, and her evidence in support thereof is in conflict with that of the appellee.

In her answer to the complainant's bill in the suit to settle her father's estate, appellant averred that she was unable to determine the boundaries of the property intended to be given to her. She joined in that suit for the purpose of selling so much of her father's estate as might be necessary to satisfy the indebtedness. With full knowledge of all the essential facts, she accepted, without objection, the benefit of sales made of her father's property, the proceeds from which were applied to her relief.

In "*White* v. *Tull*," the trial court by its decree of February 13, 1941, corrected an error in its former decree of December 19, 1940, by directing that an omitted parcel of land containing fifteen acres be included in the property purchased by Mrs. Tull from her father's estate, and ordered the special commissioners to execute and deliver to her a deed therefor. However, Mrs. Tull took no steps, after the confirmation of the sale and conveyance of the southern half of the homestead farm to the Waterfield brothers, seeking to set aside the sale. (Virginia Code, 1942, (Michie), section 6306). Nor did she, within three years, request a correction of any misrecital of the description of that land as set out in that proceeding. Virginia Code, 1942, (Michie), section 6333. She took no steps to defend or to clear the title to the eleven-acre tract after she was notified by the appellee of the claim asserted by the Waterfields.

In the deed to the Waterfields, the southern half of the homestead farm is described as bounded: "On the west by the Louis Thornton land and the land belonging to Upshur Bunting." The western boundary is not given as the eleven-acre tract, nor as "the old out let road" which bounded the eleven acres on the north and east. The boundaries of the Twyford farm do not include the eleven acres.

The lands of Harry T. White, deceased, were sold independently of any construction of his will. Nowhere in

the sale of same was there any segregation of the eleven-acre parcel from the homestead farm. In fact, the will of the testator recognized the eleven acres as a part of the homestead tract, located "in south corner main farm bounded on north & East the old out let road * * *." The description of the southern half of the homestead tract sold to Waterfield brothers includes within its bounds the eleven acres.

The evidence on behalf of the appellee shows that the Waterfield brothers have been in possession of the eleven acres and have exercised all acts of ownership over the same since their purchase in January, 1941. The deed to the Waterfields covers the property; the deed to Mrs. Tull does not.

The appellee found the premises and the timber in actual possession of the Waterfields, claiming under a paramount title. It was under no compulsion to commit a trespass in order to establish a lawful right in another action. It was prevented by a most effective means from cutting and taking the timber into possession. Mrs. Tull refused and failed to fulfilled her covenants and warranties to give appellee title and possession. Thus, there was a constructive eviction of the covenantee.

In *Jones* v. *Richmond*, 88 Va. 231, at page 235, 13 S. E. 414, we quoted with approval the following statement from Rawle on Covenants, section 154, as follows:

"Where, at the time of the conveyance, the grantee finds the premises in possession of one claiming under a paramount title, the covenant for quiet enjoyment or of warranty will be held to be broken, without any other act on the part of either the grantee or the claimant; for the latter can do no more towards the assertion of his title, and as to the former the law will compel no one to commit a trespass in order to establish a lawful right in another action."

In *Morgan* v. *Haley*, 107 Va. 331, 334, 58 S. E. 564, 122 Am. St. Rep. 846, 13 L. R. A. (N. S.) 732, we said:

"It is always necessary, in order to maintain an action for the breach of covenant of warranty, that there shall be

an eviction, and generally there must be an actual eviction; but sometimes a constructive eviction is sufficient. One class of cases where constructive eviction is sufficient, is where the premises are in the actual possession of a third party under a paramount title at the date of the conveyance. In such a case the covenantee can maintain his action, although he has never been in possession of and actually evicted from the land."

See also, *Sheffey* v. *Gardiner*, 79 Va. 313.

█ The final assignment of error is based on the contention that since the timber on the eleven-acre tract had not been cut and removed by appellee within the time fixed by its contract, it had no title to the timber, and could not properly maintain an action for it. The contention is based on the erroneous assumption that this proceeding was brought to establish title to the timber. This action was brought against Mrs. Tull for a breach of her covenants and warranties. Considering June 30, 1944, the date of her contract, as the day the breach occurred, this action, instituted on October 23, 1946, was brought well within the period of five years after the breach. Virginia Code, 1942 (Michie), section 5818.

█ The evidence amply sustains the finding of the trial judge. Under established principles, we are concluded by that finding. The judgment of the trial court is, therefore, affirmed.

*Affirmed.*